IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Richard J. Erdlen, Jr.,           :
            Petitioner       :
                                  : No.  1435 C.D. 2016
       v.                          :
                                  : Argued:  March 7, 2017
Lincoln Intermediate Unit No. 12,    :
            Respondent      :

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE JOSEPH M. COSGROVE, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

***OPINION NOT REPORTED***

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                            FILED:  July 13, 2017

Richard J. Erdlen, Jr., Ph.D. (Petitioner), petitions for review of the July 26, 2016 order of the Secretary of the Department of Education (Secretary) which affirmed a decision of the Board of School Directors (Board) of the Lincoln Intermediate Unit No. 12 (LIU) dismissing him from his position as a certified school psychologist.

**Facts/Procedural History**

The facts and procedural history of this case, as gleaned from the Secretary's findings of fact, may be summarized as follows. Petitioner has been employed by LIU as a certified school psychologist since 1985, and in 2001, he assumed the title of Supervisor of Pupil Personnel until his termination. In the latter capacity, Petitioner was a supervisor to lower-ranking psychologists and Dr. Hamme,

Assistant Director of Special Education, was his immediate supervisor with authority to issue directives. Dr. Bertram, LIU's Director of Special Education, was also a direct supervisor of Petitioner. Until the 2013 to 2014 school year, Petitioner received satisfactory ratings on his annual performance evaluations. (Findings of Fact (F.F.) at Nos. 1-4, 12.)

In November 2014, Petitioner contacted Dr. Hamme and informed him that a building administrator in Eastern York School District (Eastern York) had contacted an LIU psychologist, Dr. Kenien, who is an LIU employee working under Petitioner's supervision. The building administrator at Eastern York talked to Dr. Kenien about a situation involving the changing of a child's placement at Eastern York and questioned that change. Petitioner asked Dr. Hamme for advice on how to proceed and/or direct Dr. Kenien in this matter. In response, Dr. Hamme informed Petitioner that he and Dr. Kenien could only refer the building administrator to her own administration and internal chain of command within Eastern York and that, consistent with the LIU's policies, it was not appropriate for the LIU to get involved, especially since no one in the LIU worked with the student. (F.F. at Nos. 5-7.)

Nonetheless, after Petitioner discovered that the child at Eastern York had a placement change, he contacted Eastern York's superintendent via an email, stating that he was concerned for the child and that the change appeared to be a punishment. In his email, Petitioner also told the superintendent that there could be potential legal and liability ramifications for Eastern York as a result of the placement; that she should fact-check the information and consult with Eastern York's solicitor; and that the decision-making process in this matter would likely be castigated in a special education audit.[1] Later, on November 17, 2014, Petitioner

---

[1] In its entirety, this email reads:

**(Footnote continued on next page…)**

2

discovered that the child was returned to his initial placement, and the superintendent

---

**(continued…)**

> It has come to my attention that there is a 6th grade boy at the Eastern York MS with an IEP [individualized education program] for his learning disability. Today he was demoted to the Wrightsville Elementary School with parent approval. The fact that the change of placement is close-ended strongly suggests this is a disciplinary procedure, and more accurately, a punishment. My chief concerns are for the short-term and the long-term well-being of this child. However, I am equally intent on providing you a heads-up to the legal and liability ramifications to the District and its taxpayers.
>
> Please fact-check on the following information before deciding on a course of action. The student has manifested behavioral problems. There is no functional behavior analysis (FBA), no positive behavior support plan (PBSP), no modification through the IEP-team process, and no presentation of a notification of recommended education placement (NOREP) to the parent. The short-term nature of the placement makes it clear it is intended as a disciplinary action, a de facto suspension from his home school. Still, there was no manifestation determination conducted. In one case, 5 separate protections were bypassed. The moral imperative here is to make sure the emotional impact of this apparent attempt to "teach this student a lesson" has been considered by the mental health specialists in the District.
>
> Believe me when I say, I would be well-pleased if you could both rescue the child and reverse the decision-making process that is likely to be castigated in a special education audit. (Using these facts and not identifying the district, I checked with someone who does audits. So this opinion is not mine alone). Once the facts are verified, your solicitor's opinion would be quite valuable in trying to decide how a hearing officer would interpret such facts. I say that only because I can appreciate "Murphy's Law." I wish I could have spoken to you in person about this matter. I am writing in hope that it speeds up the review. I would be happy to speak to you by phone if necessary: 717-[XXX-XXXX]. I appreciate your attention to this important matter.

(Reproduced Record (R.R.) at 549a.)

called Petitioner to voice disapproval over how he handled the situation. The superintendent also asked Petitioner who told him about the child's situation, but Petitioner did not answer, saying that he would not engage himself in the inner workings of another agency. (F.F. at Nos. 8-9, 11.)

On November 19, 2014, Dr. Bertram received a copy of Petitioner's email to Eastern York's superintendent. Dr. Bertram stated that the appropriate protocol for a psychologist like Petitioner who had a concern about a student who was not an LIU student was to first contact her or Dr. Hamme. Dr. Bertram issued two directives to Petitioner requesting narratives about his conversations with the superintendent and when Petitioner finally responded, the narratives were cursory, incomplete, and lacking details. After looking into the matter, Dr. Bertram believed that she had to conduct "damage control" because Eastern York's staff and superintendent questioned Petitioner's professionalism and felt that he was condescending and threatening. Dr. Bertram, noting that she had never had a psychologist supervisor at or near Petitioner's rank address a superintendent the way Petitioner did, verbally reprimanded Petitioner, and, in response, Petitioner said, "Lesson learned." (F.F. at Nos. 17-19.)

Following a series of exchanges between Petitioner, his supervisors, and Eastern York personnel, Dr. Zeroth, the Executive Director of the LIU, issued a directive to Petitioner informing him that he was not a consultant or facilitator of team maintenance and should not offer to provide that service to Eastern York. Dr. Zeroth instructed Petitioner not to visit or communicate with any Eastern York or LIU staff assigned to Eastern York or to provide services to Eastern York without first receiving approval from Dr. Bertram. However, in violation of Dr. Zeroth's directives, Petitioner visited the Eastern York school principal. Petitioner said that he

4

visited the principal to discuss with him the prospects of having a new psychologist for the school because one was being transferred. (F.F. at Nos. 31-32.)

In the meantime, on November 28, 2014, Dr. Bertram directed Petitioner to send a copy of his upcoming presentation to her administrative assistant for an advisory council meeting to be held on December 9, 2014. Petitioner never provided Dr. Bertram's office with a copy of the presentation and failed to return messages asking whether he was prepared to conduct the presentation. (F.F. at Nos. 83-84.)

On December 10, 2014, a meeting was held by Dr. Bertram and Ms. Greth, the Director of Human Resources, to debrief the Eastern York matter with Petitioner and discuss his disregard of directives from superiors. At the beginning of the meeting, Petitioner started to talk about another matter and ignored Dr. Bertram and Greth. After being told to close his laptop, Petitioner requested that an attorney be present. Dr. Bertram and Greth informed Petitioner that there was no need for an attorney because they were in the initial stages of an investigation, were not making accusations, and were not imposing discipline. Dr. Bertram and Greth stated that it was LIU's standard procedure that an attorney not be present during these types of meetings. (F.F. at Nos. 33-35.)

During the meeting, Petitioner was defensive, confrontational, did not want to answer the questions he was asked, and continued to divert the meeting to other topics. The questions that Dr. Bertram and Greth asked concerned issues such as Petitioner's self-interjection into the Eastern York matter, whether he thought his actions adhered to the Code of Professional Conduct, and whether his actions reflected the role model behavior that can be expected of a supervisor and leader. When the meeting adjourned, Petitioner understood that LIU would continue its investigation and was instructed in a subsequent email sent by Greth not to speak to

anyone regarding the issues they discussed and the Eastern York matter because LIU wanted to gather the most accurate information and prevent the investigation from being compromised. However, in his response to the email, Petitioner informed Greth that he had already told people about what had happened with respect to the Eastern York matter and their meeting. In reply, Greth instructed Petitioner to provide her with a list of the people that he had spoken to, but Petitioner never complied. (F.F. at Nos. 37-38, 41-42.)

On December 17, 2014, at a regularly scheduled meeting of school psychologists, where Drs. Bertram and Hamme were in attendance, Petitioner provided the psychologists with a five question survey for them to complete. The survey asked: do you feel supported by the psychology supervisor, special education director, and executive director; what activities do you feel expressed support for school psychology; whether you would feel supported if you could invite your supervisor to a Human Resources fact-finding meeting to review your work performance; whether the psychological supervisor is a poor model for the practice of school psychology; and whether you have known the psychology supervisor to violate professional ethics? (F.F at Nos. 43-44.)

Petitioner admitted that the survey pertained to issues addressed in his meeting with Dr. Bertram and Greth. Dr. Bertram then reiterated to Petitioner that he was not allowed to discuss any issues related to their meeting or the Eastern York matter, and told him that he could not share the survey with the psychologists. In an indignant manner, Petitioner replied, "on whose authority?" (F.F. at No. 45.) Petitioner then announced to the psychologists that he was not allowed to share the survey and that Drs. Bertram and Hamme would collect the survey from them, which they did. (F.F. at No. 46.)

6

Nevertheless, at the December 17th meeting, Petitioner presented a PowerPoint presentation that had a strong parallel to the Eastern York child placement matter and indirectly referenced and presented facts identical to those involved in that situation. Although Petitioner stated that the presentation was a hypothetical scenario, Dr. Hamme could identify it as the Eastern York matter and she observed that there were questioning looks among the psychologists, which caused her to believe that others also identified the situation and knew that it was not a hypothetical situation. (F.F. at Nos. 40, 47.) Toward the end of the presentation, Petitioner shared that it was an actual situation and on a slide entitled, "Lessons Learned," Petitioner stated: "Don't be disappointed because decision-makers don't have your ethical code or professional training. They may catch up." (F.F. at No. 52.)

In addition, there were two slides toward the end of the presentation that were entitled, "Implications," and suggested consequences for the executive director and the special education director. However, Petitioner flipped through these slides and stated that he was not going to review them due to time constraints. According to Dr. Hamme, Petitioner's presentation looked like a training tool to teach the school psychologists to follow his path and adopt his point of view and he was trying to create a conflict between the staff and administration of the LIU. Dr. Hamme told Petitioner to provide him with a copy of the presentation, and Petitioner was reluctant, but he eventually submitted a copy that purportedly contained the missing slides. Petitioner later admitted that he had previously discussed the Eastern York matter at regional meetings of school psychologists without identifying the student. (F.F. at Nos. 51-53.)

7

On the same day as the meeting, December 17, 2014, Dr. Bertram provided Petitioner with a letter advising him that based upon allegations of unprofessional behavior, he was being placed on administrative leave. The LIU administration believed that this leave was necessary so that the LIU could conduct an unimpeded investigation and review information without needing to address concerns related to Petitioner's interference with the investigation. By letter dated December 18, 2014, Dr. Bertram notified Petitioner that the LIU was able to determine that modifications had been made to the PowerPoint presentation that Petitioner provided to the LIU and directed Petitioner to: provide an exact copy of the presentation and its slides; comply with Greth's directive that he identify those people that he spoke to after the December 15, 2014 meeting; and not have contact or communication with anyone in the LIU. While Petitioner was placed on administrative leave, Greth obtained statements from the superintendent of and a psychologist at Eastern York, who both voiced objections about Petitioner's behavior with respect to the child's placement and claimed Petitioner issued threats and unfair accusations. Greth also obtained a phone report for Petitioner's LIU-issued cell phone which revealed that from December 26, 2014, to January 7, 2015, Petitioner had phone calls and/or text messages with four LIU employees in violation of the directive that he not communicate with any of the LIU employees while on leave. (F.F. at Nos. 60-61, 63-68.)

Thereafter, Dr. Zeroth directed Petitioner to cooperate with Eastern York in its internal investigation. Petitioner missed three days of work, due to an illness, and left an automated out-of-office email response on his emails, which stated that he was not feeling well, but will "return to fight for truth, justice and the American way once the costume returns from the dry cleaner." (F.F. at No. 69.) In turn, Dr.

Bertram emailed Petitioner on November 25, 2014, advising him that the out-of-office response was inappropriate, unprofessional, and did not align with the guidelines the Director of Technology had previously provided to the LIU's staff. At the request of Dr. Bertram, Petitioner removed the out-of-office response. A few days later, though, Petitioner forwarded to all the LIU psychologists Dr. Bertram's November 25, 2014 email, which Dr. Bertram perceived to be an act that was disrespectful and undermined her authority. On December 3, 2014, Dr. Bertram directed Petitioner not to forward any emails from her or Dr. Hamme without their explicit permission and informed him to copy her on all emails he sends regardless of the topic and recipient, and that disregard of this directive could result in disciplinary action. Petitioner, however, continued to send emails without copying Dr. Bertram. (F.F. at Nos. 70-78.)

On January 15, 2015, Dr. Zeroth sent Petitioner a notice of hearing/statement of charges, informing him that the LIU administration was recommending to the Board that he be dismissed from his employment with the LIU. In this notice, Petitioner was notified that the Board would conduct a hearing and that the bases for his recommended discharge was persistent negligence in the performance of duties, willful neglect of duties and violation of school laws, and reiterated that a more detailed statement of the charges were sent to his attorney. On April 23, May 4, and May 13, 2015, the Board convened a hearing, and on September 1, 2015, the Board voted to dismiss Petitioner from employment. (F.F. at Nos. 85-88.)

On October 1, 2015, the Secretary received a petition for appeal from Petitioner. The Secretary then appointed a hearing officer, who conducted a hearing on October 29, 2015. (F.F. at Nos. 88-90.)

9

At the beginning of the hearing, the parties offered five joint exhibits into evidence and Petitioner called what was essentially a character witness to testify on his behalf. The Board then called Dr. Bertram to testify to the incidents discussed above and submitted numerous documents, letters, and emails into evidence that were mostly written to, from, or by Petitioner. In a very thorough fashion, Petitioner's counsel cross-examined Dr. Bertram questioning and attempting to undermine the bases for the decision to recommend Petitioner's termination. Lastly, Petitioner testified in extensive detail and at great length concerning his conduct, expressing his belief that it was warranted and proper. (R.R. at 3a-330a; 359a-493a.)

After receiving evidence and reviewing the matter, the hearing officer, in an opinion and order dated July 27, 2016, concluded that the evidence was sufficient to sustain Petitioner's dismissal. The hearing officer determined that the evidence established that beginning in November 2014, and continuing through January 2015, there were numerous occasions where Petitioner violated or failed to comply with the official directives of his supervisors. (Hearing Officer's Decision at 22.)

In making this determination, the hearing officer cited, among other instances, the following occasions where Petitioner engaged in misconduct:

> [B]etween November 14, 2014 and December 9, 2014, [Petitioner] failed to comply with numerous directives of his supervisors regarding the Eastern York matter. Dr. Hamme's directive not to involve the LIU in the Eastern York matter; Dr. Bertram's directive to provide narratives about his conversations with [Eastern York's superintendent], and when he did, he only provided a cursory summary with no significant detail; [and] Dr. Zeroth's directive that he speak only with senior leadership at Eastern York and the LIU about the investigation . . . .

\* \* \*

10

Because [the Eastern York matter] was an ongoing personnel issue, after the [December 10, 2014] meeting, Ms. Greth emailed [Petitioner] directing that he was not to speak to anyone regarding the issues they had discussed and to let her know if he had done so. Approximately three and one-half hours later, [Petitioner] emailed Ms. Greth stating he had "already done so." When she asked to whom he had spoken and about what, [Petitioner] stated he would respond to her before the week was out. However, [Petitioner] never provided the information he was directed to provide. Therefore, [Petitioner] failed to comply with Ms. Greth's directive.

\* \* \*

By using the Eastern York matter as the basis for his PowerPoint presentation, [Petitioner] violated his supervisors' directives not to discuss the Eastern York matter with anyone other than the senior administration at the LIU and at Eastern York. [Petitioner] did not specifically identify Eastern York in the PowerPoint presentation, but since he had discussed this matter with psychologists at regional meetings it is reasonable to believe the psychologists knew he was discussing the actual matter in which he had been involved. Additionally, even though [Petitioner] had been told that the LIU did not support how he had handled the Eastern York matter, he was using the PowerPoint as a training tool to teach the psychologists to follow the same path he had followed and was nudging them to his point of view . . . .

After the December 17 psychologists meeting, Dr. Bertram and Ms. Greth met with [Petitioner] to talk about the survey and the PowerPoint presentation. Although [Petitioner] had his laptop with him and was directed multiple times to provide a copy of the PowerPoint, he refused to do so at that time and stated he would send a copy before the end of the day. [Petitioner] sent a copy of the PowerPoint to Ms. Greth that day, but changes had been made and some slides had been removed; therefore, he failed to comply with the directive to produce a copy of the PowerPoint.

\* \* \*

11

After December 17, 2014, Ms. Greth continued to investigate the Eastern York matter and [Petitioner's] subsequent behavior. During the investigation, cell phone utilization records for [Petitioner's] LIU-issued cell phone were reviewed, and they evidenced that he had phone calls and text messages with LIU employees during his paid administrative leave. These communications were in violation of the directive issued to him by Dr. Bertram.

\* \* \*

The out-of-office response [Petitioner] placed on his email stated: "I am under the weather and will be out of the office for a few days. I'll return to fight for truth, justice and the American way once the costume returns from the dry cleaner." Although [Petitioner] testified that he had not been feeling well and this out-of-office response was an impulsive act, Dr. Zeroth believed that, in the context of what was happening with the Eastern York matter, it was clear what message [Petitioner] was conveying in this response . . . . [I]t is reasonable to interpret [Petitioner's] out-of-office message as relating to his actions in the Eastern York matter and that he would continue on what he believed to be a justified crusade when he returned.

\* \* \*

Dr. Bertram further directed that [Petitioner] copy her on all emails he was sending regardless of the topic and to whom they were sent. [Petitioner] failed to comply with Dr. Bertram's directive because after receiving the directive he continued to send some emails to others without copying Dr. Bertram.

\* \* \*

On November 28, 2014, Dr. Bertram directed [Petitioner] to provide the presentation to her administrative assistant. Even after Dr. Bertram's administrative assistant asked [Petitioner] about the presentation, [Petitioner] failed to comply with the directive to provide the presentation to Dr. Bertram's administrative assistant.

(Hearing Officer's Decision at 27-35.)

The hearing officer found that all of the above directives were reasonable and that Petitioner's conduct in relation thereto amounted to persistent and willful violation of or failure to comply with school laws, including official directives. The hearing officer further found, for the same reasons, that Petitioner engaged in persistent negligence in the performance of his duties and willful neglect of duties. *Id.* at 35-37. Accordingly, the hearing officer denied Petitioner's appeal and upheld the Board's decision to dismiss him from employment, and the Secretary signed the July 27, 2016 order in his official capacity.

Petitioner now appeals to this Court,[2] contending that the Secretary erred because the evidence was insufficient to support his dismissal; his conduct was protected activity under the Americans with Disabilities Act (ADA)[3] and the Rehabilitation Act of 1973 (RA);[4] the LIU imposed an unlawful command or "gag" order on him not to discuss certain subjects with other LIU staff; and the LIU failed to provide, in accordance with due process, adequate notice of the charges and a proper hearing on those charges.

---

[2] "This Court's standard of review of a decision of the Secretary of Education is limited to [the] determination of whether substantial evidence supports necessary factual findings, and whether an error of law or constitutional violation was committed." *Curl v. Solanco School District*, 936 A.2d 183, 185 n.1 (Pa. Cmwlth. 2007).

[3] 42 U.S.C. §§12101-12213.

[4] 29 U.S.C. §§701-796i.

## Sufficiency of the Evidence

Petitioner contends that the evidence was legally insufficient to support his dismissal, arguing that the Secretary impermissibly aggregated minor incidents and "petty annoyances." (Petitioner's brief at 24.) Petitioner asserts that his conduct does not reflect the level of persistent negligence necessary to justify his discharge and that he did not willfully ignore or disobey any significant directives.

Section 1122(a) of the Public School Code of 1949 (Code), Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §11-1122(a), states that a professional employee may only be dismissed for the reasons set therein. *See Foderaro v. School District of Philadelphia*, 531 A.2d 570, 571 (Pa. Cmwlth. 1987). The statutory bases for discharge under section 1122(a) of the Code are:

> (a) **The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be** immorality; incompetency; unsatisfactory teaching performance based on two (2) consecutive ratings of the employe's teaching performance that are to include classroom observations, not less than four (4) months apart, in which the employe's teaching performance is rated as unsatisfactory; intemperance; cruelty; **persistent negligence in the performance of duties**; willful[l] neglect of duties; physical or mental disability as documented by competent medical evidence, which after reasonable accommodation of such disability as required by law substantially interferes with the employe's ability to perform the essential functions of his employment; advocation of or participating in un-American or subversive doctrines; conviction of a felony or acceptance of a guilty plea or nolo contendere therefor; **persistent and wil[l]ful violation of or failure to comply with school laws of this Commonwealth** (including official directives and established policy of the board of directors); on the part of the professional employe . . . .

24 P.S. §11-1122(a) (emphasis added).

This statutory section provides that a professional employee may be terminated, among other reasons, for the "persistent and wil[l]ful violation of or failure to comply with school laws of this Commonwealth . . . ." *Id.* In determining whether a persistent and willful violation of a school law has occurred, this Court must examine three elements: persistency, willfulness, and a violation of a school law. *Horton v. Jefferson County—Dubois Area Vocational Technical School*, 630 A.2d 481, 482 (Pa. Cmwlth. 1993). "Persistency is held to exist when the violation occurs either as a series of individual incidents or one incident carried on for a substantial period of time. Wil[l]fulness requires the presence of intention and at least some power of choice." *Id.* Further, this Court has "interpreted 'willful violation of the school laws' to include not only violations of the Code, but also violations of rules and orders of the employee's superior." *Harris v. Commonwealth Secretary of Education*, 372 A.2d 953, 957 (Pa. Cmwlth. 1977).

Additionally, section 1122(a) of the Code permits a professional employee to be discharged when the employee engages in "persistent negligence in the performance of duties . . . ." 24 P.S. §11-1122(a). The Code does not define the charge of persistent negligence. *Lauer v. Millville Area School District*, 657 A.2d 119, 121 (Pa. Cmwlth. 1995). Nevertheless, this Court has observed: "Dismissal for persistent negligence is warranted when a teacher fails to comply with a directive of supervisors *on numerous occasions*. In fact, a single act, *continued for a period of time*, may support dismissal for persistent negligence." *Id.* (citations omitted; emphasis in original.)

In comparing and contrasting a charge of persistent and willful violation of school laws with persistent negligence in the performance of duties, this Court has commented:

15

> The charge of willful and persistent violation of school laws and the charge of persistent negligent performance of job duties seem often to be combined in a discharge proceeding. The same act may be used to support both charges . . . .
>
> Each charge consists of several elements, and the district must prove all elements. Persistency is one element shared by both charges. Knowledge is another common element.
>
> For a violation of a school law to be willful, the district must show that the employee knew of the school district's policy in question and deliberately chose not to comply . . . .
>
> [F]or negligent performance to be shown, the school district must prove that the professional employee had knowledge of the school district's performance expectations and had been warned of the consequences of failing to meet them . . . .
>
> Negligent performance does not require the existence of a clearly adopted or articulated board policy. However, the professional employee must be advised that certain conduct is unacceptable . . . .

*McFerren v. Farrell Area School District*, 993 A.2d 344, 357-58 (Pa. Cmwlth. 2010).

In *McFerren*, we summed up the burdens of proof for, and the subtle distinction between, the two charges as follows:

> In sum, to prove charges of willful and persistent violation of a school law and persistent negligence in performance of duties, the school district must prove (1) persistency in the form of numerous incidents of the same misconduct and (2) knowledge that the conduct in question was wrong and that its repetition could lead to discipline or discharge. For a violation of a school law, the school district must point to an adopted policy or order that was deliberately violated. For negligent performance of a duty, the district must specifically advise the employee of that duty . . . . Finally, the negligent performance must be serious, not picayune.

*Id.* at 358.

16

In *McFerren*, a high school district terminated a principal on four different statutory grounds and the Secretary affirmed on *de novo* review. The Secretary treated the charges of persistent negligence and persistent violation of a school law as one count and concluded that when considered in the aggregate, a series of isolated incidents proved that the principal violated both charges. In that case, the principal: told the superintendent, after disciplining a basketball player, "that he could do what he wanted;" failed to update the school's website as required by his job duties and did not advise the superintendent of problems with the website; did not respond to the superintendent's repeated requests for a report on the number of students to be enrolled in next year's classes; and failed to obtain the superintendent's approval before taking a vacation leave. In addition, the principal instituted a new schedule that resulted in teachers not having a class assignment for thirty minutes a day; created a new program that was unsuccessful and not implemented correctly; allowed teachers to leave early on the day before Christmas vacation; and scheduled staff meetings which resulted in a late start for high school students. Further, the principal did not advise the superintendent when he left the building to go to lunch; did not make plans for four extended development days as required by a collective bargaining agreement; and responded to a board member's question during an official session while his back was turned toward the member.

This Court reversed on appeal, concluding that the evidence was insufficient to establish that the principal engaged in persistent and willful violation of a school law. We further found that the evidence was legally inadequate to demonstrate that the principal committed persistent negligence in the performance of his duties. In these regards, we reasoned:

> First, persistency is lacking from the [the school district's] case. The essence of persistency is repetition. There can be

17

no repetition where the acts or omissions in question are unrelated to one another; the acts in question must be the same or very similar to be persistent . . . . Here, the conduct in each incident cited by the Secretary bears little or no relationship to that in the next incident. There is no common thread between not maintaining the [school district's] website, for example, and talking back to [the superintendent] at a meeting to discuss discipline of a basketball player . . . .

If there is a common thread to the incidents relied upon by the Secretary, it may lie in the findings about [the principal's] conduct with superiors. He talked back to [the superintendent] at a meeting in a manner [the superintendent] considered insubordinate and [the principal] had to be told to turn around at a school board meeting to listen to the board member's denunciation of him. However . . . we conclude that two incidents over two and a half years do not satisfy the requisite persistency standard.

Second, the [school district] did not satisfy the knowledge element. [The principal's] personnel file is absent of any warnings from his supervisor [but his contract states "that [r]epeated infractions or those of a serious nature will be submitted, entered and maintained in the central file in the superintendent's office."]

The District did not prove that [the principal] had knowledge that he had committed "repeated infractions" or infractions "of a serious nature." In the absence of this knowledge, the [school district] cannot demonstrate that his conduct constituted willful violation of school law or a negligent performance of his job . . . . Not one of the incidents cited by the Secretary to support these two charges was submitted, entered or maintained in the central file in the superintendent's office.

Third, it is not clear to the Court that all the incidents in question are serious and rise above the level of the picayune . . . . However, the Court declines to do a point-by-point analysis of each incident to determine whether each act cited by the Secretary was trivial or serious enough to warrant a discharge. What may seem trivial in significance

18

to the Court may, in actuality, be important in an educational setting . . . . However, these expectations must be made known to the professional employees governed by them. Board policy and performance expectations cannot be adopted on an *ad hoc* basis, or after-the-fact, to accommodate a school board's desire to discharge an employee prior to the completion of the contract period.

993 A.2d 359-60 (citations and internal quotation marks omitted).

Based upon this rationale, we concluded in *McFerren* that the Secretary erred in holding that the District's evidence proved its charge of willful and persistent violation of a school law and also its charge of persistent negligence in the performance of duties.

On the other side of the spectrum, the Court held in *Johnson v. United School District*, 191 A.2d 897 (Pa. Super. 1963), that a teacher could validly be dismissed for failing to attend an "open house" for the parents of her students. There, the teacher was told by her administrative superior that she must attend "open house" when she was interviewed, at a subsequent teacher's meeting, and on one later occasion. The teacher informed her administrative superior that she would not attend "open house," was again instructed by her superior that she must attend, responded that she would not attend, and did not go to the open house, deciding instead to go to a personal event. Quoting the "inimitable language" of former Justice Michael Musmanno, the Court rhetorically questioned: "How can children be expected to show respect toward their teachers if they learn that the teachers themselves are disrespectful to *their* superiors? . . . . What would happen to all organized society if government employees could close their eyes to directives which control the intermission of the vast complicated gears of governmental machinery?"

*Id.* at 901 (quoting *Board of Public Education, School District of Philadelphia v. Bernard August*, 177 A.2d 809, 819-20 (Pa. 1962) (majority opinion by Musmanno, J.)).

Against the backdrop of this quotation, the Court in *Johnson* noted the "persistence of the [teacher] in her announced refusal, without cause, to accept her assignment to open house," *id.* at 901, and concluded that:

> Any school teacher who lacks an understanding of her responsibility to be present on this occasion [i.e., open house] and who arrogantly refuses to obey the direction of her employer to be there and instead follows her own personal whims and pleasures can properly be held by the board employing her to be unfit to continue in the employment of that board.

*Id.* at 900.

Notably, the Court in *Johnson* determined that the teacher engaged in persistent misconduct by refusing to attend *one* open house when she was repeatedly warned by her superior that attendance was required and mandatory. *See Belasco v. Board of Public Education*, 486 A.2d 538, 542 (Pa. Cmwlth. 1985) (not that "even a single incident may amount to persistent behavior" but clarifying that "[t]his is true only where an incident is carried on for a 'substantial' period of time."). The Court also found that the teacher's discharge was warranted under both the persistent negligence and willful violation standards: "The [teacher] here not only closed her eyes to a directive, but arrogantly persisted in her announced intention not to comply with the directive. This conduct was an act of negligence and would also be classified as persistent and wil[l]ful violation of the school laws." *Johnson*, 191 A.2d at 900.

In *Spano v. School District of Brentwood*, 316 A.2d 162 (Pa. Cmwlth. 1974), this Court concluded that an administrator, namely a "curriculum

20

coordinator," who refused to confine her activities to those which the superior directed her to perform, was properly dismissed for persistent and willful violation of the school laws. The administrator in the *Spano* case called the superintendent an "autocratic administrator," and basically a "liar," and told others that the superintendent was not "her boss" and that she did not have to follow his orders. *Id.* at 164. The administrator also circulated a proposed kindergarten course of study without consulting the kindergarten teachers, the elementary school principal, or the superintendent. Finally, the administrator, although lacking the authority, made a teacher under the supervision of the superintendent initial all written correspondence with the superintendent.

Given these incidents, we concluded that the administrator "exceeded her authority as 'curriculum coordinator,' openly questioned [the superintendent's] authority and violated his directives." *Id.* We also added:

> Obviously, [the administrator] and [the superintendent] had different concepts of not only the functions of the job of 'curriculum coordinator,' but also the job's importance and position within the school district's administrative hierarchy. Since Matika was the Superintendent of the School District, and therefore [the administrator's] superior, it was incumbent on [the administrator], *once she understood what was expected of her and her position*, to genuinely attempt to fulfill that role . . . .

*Id.* at 164 (emphasis in original). Accordingly, this Court in *Spano* affirmed the school board's dismissal of the administrator for persistent and willful violation of a school law.

When the Secretary determines that there are multiple statutory grounds or reasons supporting termination, this Court need only find that one of them are valid in order to affirm the Secretary's decision. *Horton*, 630 A.2d at 482. Instantly,

21

the facts as found by the hearing examiner, and as adopted by the Secretary, are much more analogous, in terms of both degree and kind, to those in *Spano* and *Johnson* than they are to those in *McFerren*. Akin to the conflict between the curriculum coordinator and the superintendent in *Spano*, Petitioner overstepped the bounds of his authority, disobeying clear and reasonable directives from his superiors, and, in the process made explicit attempts to severely undermine their authority. As elucidated more fully above by the hearing officer, Petitioner engaged in defiant behavior with respect to the Eastern York matter and this behavior persisted, on a continual basis, for approximately one month in a variety of instances. In this aspect, Petitioner's conduct was much like that of the teacher in *Johnson*, who was steadfast in her refusal to attend open house despite numerous directives from her supervisor that she must attend.

For example, although directed not to engage in such conduct, Petitioner discussed the Eastern York matter and the LIU's investigation with other psychologists, failed to provide his superiors with requested information integral to the investigation, and performed actions that not only disobeyed his superiors' commands, but also were done with the apparent intent of thwarting the investigation. Unlike the nature of the principal's alleged course of misconduct in *McFerren*, Petitioner's misconduct emanated from and had as its common thread the Eastern York matter, which served in one way or another as the general setting or basic theme underlying the defiance of his supervisors' orders. Moreover, in contrast to the circumstances in *McFerrern*, Petitioner's supervisors clearly articulated to Petitioner that which he could not do, yet Petitioner persistent in doing just that, with full awareness and knowledge that which he had done was forbidden. In essence, Petitioner carried a banner that his supervisors told him not to carry; he was aware of

22

the strife he was causing; and he made his intention to be disobedient to his supervisors clear in his survey to the psychologists at the December 17, 2014 meeting, his out-of-office email response proclaiming that he would return "to fight for truth, justice and the American way," and his PowerPoint slide stating that the "decision-makers don't have [his] ethical code or professional training." (F.F. at Nos. 52, 69.)

In his brief, Petitioner portrays his conduct in a different light, which can be summarized thusly: "Instead of understanding that [Petitioner] had the interests of the student at heart and used the broad facts of that case to formulate some training for the school psychologists he supervised, the LIU went overboard to satisfy its customer [i.e., Eastern York] at the expense of [Petitioner] who became the target." (Petitioner's brief at 30.) However, in proceedings like these, the Secretary conducts de novo review and acts as the ultimate fact-finder with the power to determine the credibility of witnesses, the weight of their testimony, and the inferences to be drawn therefrom. *Katruska v. Bethlehem Center School District*, 767 A.2d 1051, 1056 (Pa. 2001); *Belasco v. Board of Public Education of the School District of Pittsburgh*, 510 A.2d 337, 342-43 (Pa. 1986). As fact-finder, the Secretary declined to view the facts through the lens that Petitioner offers, it was within the exclusive province of the Secretary to do so, and we cannot, under our standard of review, second-guess the Secretary's credibility and weight determinations.

Therefore, on this record, we conclude that the Secretary did not err in concluding that Petitioner engaged in willful and persistent violation of a school law in consistently refusing to obey his supervisors' directives. Although willful violation of a school law and persistent negligence in performance of duties share common elements and overlap to a notable extent in theory, we believe that the

sturdiest ground for affirmance lies in the former. This is because, while violation of a school law requires proof that an order or directive was disobeyed deliberately, negligence necessitates evidence that the employee was specifically advised of a duty and is most suitable in instances where an employee thereafter does not live up to that duty through the exercise of reasonable care and/or effort. In other words, a willful violation of a school law can be summed up as a form of direct defiance of an order while persistent negligence can be characterized as failing to achieve stated goals or a certain level of achievement. Accordingly, we rest our conclusion on the ground that the evidence was sufficient to establish that Petitioner persistently and willfully violated a school law.

**The ADA and RA**

Petitioner argues that the LIU discharged him in retaliation for advocating on behalf of a special education student in violation of the ADA and RA. For support, Petitioner cites *Barker v. Riverside County Office of Education*, 584 F.3d 821 (9th Cir. 2009), wherein the Ninth Circuit held that a special education teacher had standing to maintain a retaliation claim under the ADA and the RA against the local school district that fired her. The teacher in that case alleged that she was fired in retaliation for advocating on behalf of her disabled students.

We find that Petitioner's argument lacks merit for three primary reasons.

First, Petitioner was allegedly advocating for a student that was not under his or the LIU's professional services and, absent such a relationship, it is at least doubtful that he has standing to vicariously assert the student's rights or advocate on his behalf. It must also be noted that in discussing the student's situation with Eastern York's officials, Petitioner violated an express command from his

24

superiors and LIU's policy not to intermingle in such affairs, and Petitioner does not contend that LIU's policy is unreasonable or fails to advance the institutional goal of maintaining and respecting the autonomy between Eastern York and the LIU.

Second, as succinctly yet ably explained by the hearing officer:

> [Petitioner] argues he was advocating for the Eastern York student and his dismissal was, therefore, not appropriate. However, Petitioner testified the Eastern York student was returned to the student's original placement on November 18, 2014. Therefore, even if [Petitioner] believed his failure to comply with Dr. Hamme's November 14 directive was justified, there was no justification for his failure to comply with his supervisors' directives thereafter.

(Hearing Officer's Decision at 27.)

Third, to succeed on a retaliation claim under the ADA or RA a claimant must prove, among other things, a causal connection between the employee's protected activity and the employer's adverse action. *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir. 1997). Here, the Secretary found that the real reason the LIU discharged Petitioner was because he continuously disobeyed his supervisors' directives. Naturally implicit in this determination is the Secretary's rejection of any inference that the LIU discharged Petitioner as a result of the fact that he advocated against the child's placement in the Eastern York matter. *See also* R.R. at 704a. Again, this is an issue that is entirely dependent on the credibility and the weight to be afforded to the evidence by the fact-finder. The Secretary declined to draw the inference that Petitioner proposes, and so must we. Therefore, Petitioner's argument is meritless.[5]

---

[5] We do note that the LIU represents in its brief that Petitioner's discrimination and retaliation claims are currently pending in the United States Department of Education, Office for Civil Rights. (LIU's brief at 25.)
**(Footnote continued on next page…)**

25

## The "Gag" Order

Petitioner contends that by directing him not to discuss the meeting or the investigation with other employees of the LIU, Dr. Bertram and Greth committed an unfair labor practice and violated his rights to engage in concerted activities for the purposes of collective bargaining under the National Labor Relations Act (NLRA).[6]

We summarily dispose of this argument. Initially, the LIU is considered to be a public entity, *see generally Arnold v. BLaST Intermediate Unit 17*, 843 F.2d 122 (3d Cir. 1988), and the NLRA simply does not apply to public employers, *Lyes v. City of Riviera Beach, Florida*, 166 F.3d 1332, 1342 (11th Cir. 1999) (en banc) (citing Section 152(2) of the NLRA, 29 U.S.C. §152(2)). Moreover, even if the NLRA applied to the LIU, it is beyond cavil that claims under the NLRA belong to the exclusive jurisdiction of the National Labor Relations Board, *International Longshoremen's Association v. Davis*, 476 U.S. 380, 389-91 (1986), and if Petitioner wanted to advance his claim before that Board, he should have filed a declaratory action seeking to stay the Secretary's proceedings or asserted a claim and/or the defense of preemption under the NLRA, *see Bud Antle, Inc. v. Barbosa*, 35 F.3d 1355, 1362-63 (9th Cir. 1994). Petitioner did not do so and the consequent result is that he cannot litigate an NLRA unfair labor practice claim in these proceedings.

---

**(continued…)**

[6] 29 U.S.C. §§151 — 168.

**Due Process – Adequate Notice and Prompt Hearing**

Finally, Petitioner contends that the termination procedures of the Code were violated, *see* section 1127 of the Code, 24 P.S. §11-1127, as well as his due process rights, and that the Secretary erred in failing to find that the LIU did not provide him with adequate notice of the charges or a meaningful hearing on the charges. More specifically, Petitioner contends that the notice of hearing/statement of charges was defective because it was not signed by the president of the Board of the LIU, was not attested to by the secretary of the Board, did not indicate that it was sent via registered mail, was not delivered after the Board passed a resolution dismissing him, and the details of charges were provided to Petitioner's counsel and not Petitioner himself.

However, Petitioner did not raise any of these issues before the Secretary. Pursuant to doctrinal case law, these issues are waived and cannot be raised in this Court for the first time. *See Ward v. Board of Education of the School District of Philadelphia*, 496 A.2d 1352, 1356 (Pa. Cmwlth. 1985) ("As he failed to raise this issue before the Secretary, it may not be considered for the first time on judicial review and we must consider that issue as waived."); *see also M.T. v. Department of Education*, 56 A.3d 1, 10 n.12 (Pa. Cmwlth. 2010) ("The failure of a party properly to raise and preserve an issue before an administrative agency results in waiver of that issue before this Court."); *East Allegheny School District v. Secretary of Education*, 603 A.2d 713, 715-16 n.5 (Pa. Cmwlth. 1992) (finding due process claim regarding the lack of hearing waived where petitioner did not raise the

issue before the Secretary).[7]   Therefore, we conclude that Petitioner's final issues do not merit relief.[8]

_____

[7] Even if these issues were not waived, we note that Petitioner's claims essentially challenge the procedural and technical aspect of his termination. "While not capable of an exact definition, basic elements of procedural due process are adequate notice, the opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case." *Commonwealth v. Wright*, 961 A.2d 119, 132 (Pa. 2008).

Here, the notice of hearing/statement of charges advised Petitioner that his recommended dismissal was "based on persistent negligence in the performance of duties and willful neglect of duties and violation of school laws as contemplated by Section 1122 of the Public School Code" and reiterated that "[t]he recommendation for dismissal and the nature of the charges against you have been summarized in a letter to your attorney dated January 15, 2015." (R.R. at 518a-19a.) The notice of hearing/statement of charges also informed Petitioner of his "statutory and constitutional rights to a hearing before the Board," explained to him his right to present evidence, and provided him with the date and place of the hearing. *Id.* Further, the notice was signed by Dr. Zeroth, the Executive Director of the LIU, Petitioner admittedly received the notice, and his attorney, or, in other words, authorized agent, received the details of the charges on his behalf.

On this record, Petitioner clearly received fair and sufficient notice and, as the transcript of the hearing indicates, a full opportunity to present his case and litigate the issue as to whether he should be discharged. In this context, the fact that the notice of hearing/statement was not signed by the President of the Board, was not attested to by the Secretary of the Board, and may not have been delivered through registered mail, assuming these are statutory violations, they are *de minimis* in nature. Notably, Petitioner does not allege (nor can we discern) that he suffered any prejudice as a result of these purported statutory transgressions. *See Messina v. East Penn Township*, 995 A.2d 517, 533 (Pa. Cmwlth. 2010) (en banc) ("[A] party raising a procedural due process challenge usually must prove prejudice"); *see also D.Z. v. Bethlehem Area School District*, 2 A.3d 712, 722 (Pa. Cmwlth. 2010) ("Because demonstrable prejudice is a 'key factor' in determining whether a denial of procedural due process occurred, and because [the petitioner] does not clearly explain how she suffered prejudice, no procedural due process violation is apparent.") (citation omitted).

[8] To the extent that Petitioner claims that the Board failed to pass a resolution or otherwise resolve to terminate him from employment prior to the hearing, and that Dr. Zeroth's notice of hearing/statement of charges was insufficient because she was a member of the administrative staff and not the Board, this argument does appear to possess merit. *See School District of Philadelphia v. Jones*, 139 A.3d 358, 370-71 (Pa. Cmwlth. 2016) (en banc); *Patchel v. Board of School Directors of Wilkinsburg School District*, 400 A.2d 229 (Pa. Cmwlth. 1979) (stating and reaffirming the proposition that, under section 1127 of the Code, the Board – and not administrative staff and/or
**(Footnote continued on next page…)**

**(continued…)**

officials – must initially and officially resolve or make the decision to demote and/or terminate a professional employee before a hearing is held); *Abington School Board v. Pittenger*, 305 A.2d 382, 387 (Pa. Cmwlth. 1973); *see also Vladmirsky v. School District of Philadelphia*, 144 A.3d 986, 994-1000 (Pa. Cmwlth. 2016) (citing and discussing *Pittenger*). However, Petitioner did not raise this argument before the Board or the Secretary and it would be manifestly unjust to allow him to set aside his termination on this procedural ground when he has asserted it for the first time in this appeal at this late stage of the proceedings. Indeed, in *Pittenger*, this Court emphasized:

> We repeat, the record in this case is not one where the professional employe sat back and asserted no claim to an improper procedural defect in his demotion. [The petitioner's] counsel, in every proceeding, has raised this issue. It would have been a simple matter for the Board to have cured the defects at the outset. The Board only needed to have passed a resolution that it had sufficient evidence to support its belief, to demote [the petitioner] by some given date, and therein direct the Secretary and President of the Board to serve notice upon [the petitioner] of this fact and to advise him of his right to a hearing. At this point, [the petitioner] would have had a decision to make: whether to request the hearing or consent to the demotion. The Board did not follow this procedure. Instead, it permitted its administrative staff to demote [the petitioner] without Board action, and only after [the petitioner] demand for a hearing, set the wheels in motion for a hearing several months later. As alluded to hereinbefore, the Board did not know the contents of the charges which had been promulgated by the Principal until the first day of hearing. This was improper.

*Pittenger*, 305 A.2d at 384.

As noted in *Pittenger*, had Petitioner raised his argument regarding the Board's lack of involvement with the pre-termination notice in a timely fashion, the Board could have easily rectified the error by passing a resolution. Although some may deem Pennsylvania's waiver rule to be unnecessarily strict, there is good reason not to allow Petitioner to raise this waived argument now because, although Petitioner was validly terminated on the merits, he could potentially receive years' worth of back-pay – for time in which he did not work – based upon a procedural irregularity that was readily curable. *See Jones*, 139 A.3d at 376-77. If this Court permitted Petitioner to raise his argument and addressed it on the merits, we would, in effect, condone the practice of allowing a party to sit back in silence, take a chance through the lengthy adjudicatory process, and when worse comes to worse, pull out a game-winning card that results in an unfair wind fall. *See Zeman v.*

**(Footnote continued on next page…)**

## Conclusion

For the foregoing reasons, we conclude that there was sufficient evidence, as a matter of law, supporting the Secretary's decision to terminate Petitioner from his employment. We further conclude that Petitioner's claims and/or purported defenses under the ADA, RA, and NLRA are devoid of merit. Finally, we conclude that Petitioner's remaining arguments are waived for failing to properly raise and preserve them before the Secretary. Accordingly, we affirm the Secretary's July 26, 2016 order.

_____
PATRICIA A. McCULLOUGH, Judge

---

**(continued…)**

*Borough of Canonsburg*, 223 A.2d 728, 729-730 (Pa. 1966) ("A party may not remain silent and take his chances on a verdict and then, if it is adverse, complain of mere inadequacy which could have been corrected."). This we will decline to do and, instead, will follow Pennsylvania's longstanding rule on waiver. *See Commonwealth v. Colavita*, 993 A.2d 874, 891 (Pa. 2010) ("It is a settled principle of appellate review, of course, that courts should not reach claims that were not raised below . . . . This Court has consistently held that an appellate court cannot reverse . . . on a basis that was not properly raised and preserved by the parties . . . . The rule is no different in the constitutional context.") (citation and internal quotation marks omitted).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Richard J. Erdlen, Jr.,         :
        Petitioner     :
                           :  No.  1435 C.D. 2016
        v.           :
                           :
Lincoln Intermediate Unit No. 12,  :
        Respondent   :

## ***ORDER***

AND NOW, this 13th day of July, 2017, the July 26, 2016 order of the Secretary of the Department of Education is hereby affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Richard J. Erdlen, Jr.,                    :
                  Petitioner          :
                               :
     v.                                   :
                               :
Lincoln Intermediate Unit No. 12,          :   No. 1435 C.D. 2016
                  Respondent        :   Argued:  March 7, 2017

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE JOSEPH M. COSGROVE, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

CONCURRING AND DISSENTING
OPINION BY JUDGE COSGROVE       FILED:  July 13, 2017

        Richard J. Erdlen, Jr. (Petitioner) acted in a manner that was clumsy at best, but could easily be characterized as rude and obnoxious.  The record, however, suggests that throughout this incident, Petitioner was primarily motivated by his concern for the well-being of a child.  The response on the other side, however, whatever its positive motives, seems replete with concern that outside discussion would damage institutional reputation.  As a result, no one comes out of this controversy looking their best.

        This is the type of case which should have been the subject of mediation.  There, the parties would have been able to present their differences, and perhaps a lengthy educational career could have been protected, and concerns for the subject child addressed.  The result mandated by the Majority would possibly have been the same, but just as possibly not.  Whether the door to

amicable resolution between the parties themselves is closed or not is certainly up to them.

This Court's involvement in all this should be limited to the narrow issue of whether the record requires affirmance or reversal of the termination decision. I do not agree with the Majority's resolution of Petitioner's claim under the Americans with Disabilities Act (ADA),[1] as that may continue to have life, nor do I agree with the Majority's waiver analysis. On these points, I dissent. Taking these issues out of the equation, however, and on the thin ground remaining, I concur only in the result.

_____
JOSEPH M. COSGROVE, Judge

---

[1] 42 U.S.C. §§ 12101-12213.